(67 Misc. Rep. 212.)

HASTINGS PAVEMENT CO. v. CROMWELL, Borough President.

(Supreme Court, Special Term, Richmond County. April, 1910.)

1. MUNICIPAL CORPORATIONS (§ 330*)—CONTRACTS—CONDITIONS—COMPETITION.
    Where the New York City board of estimate and apportionment, in awarding contracts for public work, imposes only such conditions as allow a fair and reasonable opportunity for competition, the courts cannot interfere.
    [Ed. Note.—For other cases, see Municipal Corporations, Cent. Dig. §§ 854, 855; Dec. Dig. § 330.*]

2. MUNICIPAL CORPORATIONS (§ 330*)—CONTRACTS—ADVERTISEMENT.
    Where, because of the steep grade of a road, it was determined to pave a portion thereof with bitulithic pavement or asphalt blocks de-

signedly omitting smooth pavements, an advertisement for bids on such pavements presented a fair and reasonable opportunity for competition.

[Ed. Note.—For other cases, see Municipal Corporations, Cent. Dig. §§ 854, 855; Dec. Dig. § 330.*]

3. MUNICIPAL CORPORATIONS (§ 336*)—CONTRACTS—INJUNCTION—AFFIDAVITS.
    In an action to enjoin the awarding of a contract for a street pavement, the intent of the municipal authorities as to the acceptance or rejection of particular bids bearing upon the propriety of the transaction was properly stated by the municipal officers in their answering affidavits and considered by the court, where a question was raised in respect to such intent by plaintiff.

[Ed. Note.—For other cases, see Municipal Corporations, Dec. Dig. § 336.*]

Application by the Hastings Pavement Company against George Cromwell, as President of the Borough of Richmond, and another, to continue pendente lite injunction orders previously granted. Application denied.

L. Lafflin Kellogg, for Hastings Pavement Co.
Edward M. Grout and Paul Grout, for Uvalde Asphalt Paving Co.
Archibald R. Watson, Corp. Counsel (Francis Martin and John F. Collins, of counsel), for defendants.
Chase Mellen, for Standard Bitulithic Co.

CLARK, J. Application by the plaintiffs in two separate actions, involving substantially the same subject-matter, to continue pendente lite injunction orders previously granted with a temporary stay. This opinion is written in both actions.

On December 27, 1909, the president of the borough of Richmond advertised for sealed bids, which would be received until 12 o'clock noon, January 11, 1910, for regulating and paving a portion of the Fingerboard road with bitulithic pavement, or with asphalt blocks. On January 10, 1910, there were issued the injunction orders above referred to, against the awarding of bids returnable January 15, 1910. Between the two actions under consideration there is a single difference, namely, that in action No. 1 the plaintiff was an unsuccessful bidder; whereas, in action No. 2 no bid was made by the plaintiff.

For the contract in question nine bids were received; six (of which one was the bid of the plaintiff in action No. 1) for the laying of asphalt block pavement, and three for the laying of bitulithic pavement. The three bids for the laying of bitulithic pavement were made at figures varying between $20,000 and $21,000; five of the bids for the laying of asphalt block pavement were made at figures between $18,000 and $28,000. The sixth bid for asphalt block pavement, that of Rafferty Bros., was $14,621.30, which amount, as compared with the lowest bid (namely, the bid of the plaintiff in action No. 1, at $18,281.30), showed a difference of $3,660 in favor of the city. Bidding was, therefore, not stifled and may result in the saving to the city of $3,660. Upon the above facts the plaintiff taxpayers have fallen far short of establishing that, in its possible results, the action

*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes

of the city has caused "waste of, or injury to, the estate, funds or other property of the city." Code Civ. Proc. § 1925.

Although the president of the borough has, since opening the bids, declared his intention of accepting the Rafferty bid for block pavement, counsel for the plaintiffs claim that such expression of intent is incompetent, and that the present motion must be determined as of the date of the advertisement. The expression of such intent, however, was directly drawn out by the plaintiff (Complaint Action No. 1, par. 15) and properly appears in the answering affidavit of the president of the borough.

The propriety of an allegation of present intention, in cases of this class, was recognized in Barber Asphalt Paving Co. v. Willcox, 90 App. Div. 245, 247, 86 N. Y. Supp. 69, 70, where Mr. Justice Laughlin says:

"The plaintiff alleges, and it is not denied, that the defendants intend to accept the proposal for the patented pavement and to award the contract accordingly."

Upon the oral argument there was discussed the question whether the advertisement presented a fair and reasonable opportunity for competition. Greater New York Charter, § 1554 (Laws 1901, c. 466). The plaintiffs based their right to an injunction upon the authority of Rose v. Low, 85 App. Div. 461, 83 N. Y. Supp. 598, while the defendants urged a decision in their favor upon the authority of Warren Bros. Company v. City of New York, 190 N. Y. 297, 83 N. E. 59. Neither of these decisions, alone, is a controlling authority in the case at bar; with them must be read the report of the Warren Case below (119 App. Div. 856, 103 N. Y. Supp. 1145), noting particularly the dissenting opinion of Mr. Justice Clarke.

In all these cases is recognized and placed beyond dispute the proposition stated by Mr. Justice Ingraham in the Rose Case:

"The board of estimate and apportionment are authorized to impose the conditions to secure a fair and reasonable opportunity for competition, and where the conditions imposed by them do give such an opportunity the court could not interfere."

There is not needed, therefore, any discussion as to the controlling influence of section 1554 of the charter. The question to be considered here is: Has competition been safeguarded?

In the Rose Case, above cited, the patented bitulithic pavement alone was offered to bidders; in the Warren Case, three pavements were offered; in the case at bar, two. The plaintiffs urge that the omission of sheet asphalt in this case invalidates the whole proceeding. The fallacy of this contention lies in the fact that whereas, in the Rose and Warren Cases, for paving Seventh avenue and Seventy-Second street, respectively, there was required "a smooth, noiseless pavement," no such requirement exists here. For the Fingerboard road is needed a rough pavement on account of steep grades. Sheet asphalt was designedly omitted because it was not adapted to the contemplated improvement and, therefore, was not entitled to a place in the competition.

The president of the borough of Richmond and the local board of that borough determined that the roadway in question should be paved. The roadway was not level, but a country road with steep grades. Exercising the power conferred upon the borough president by section 383 of the Greater New York charter, followed by action of the local board under section 428 of the charter, the local board purposely omitted, in presenting the proposed improvement to the board of estimate and apportionment, to include sheet asphalt as a proper or suitable pavement for the locality in question. An examination of the charter shows that the initiative, in the laying of pavements, lies with the borough president and the local board; the board of estimate having no power to act upon local improvements, until requested by the local boards of the several boroughs. This power of initiation cannot be exercised in a perfunctory and mechanical way. In all public improvements there must be had, before the borough president or the local board shall act, such investigation of facts as will enable them to act intelligently and for the best interests of the borough and city. What is suitable for the level stretches of Seventh avenue or Seventy-Second street may be wholly unsuited to a country road with steep grades. The difference between such localities would naturally be considered, and would become an important determining factor in the final conclusion as to adaptable methods for carrying out a needed public improvement. In the intelligent exercise of their powers, the president and local board of the borough of Richmond decided that sheet asphalt was not a suitable pavement for the Fingerboard road.

The affidavit of Oxholm, engineer of the borough of Richmond, thus explains why sheet asphalt was unsuitable:

"Deponent further says that along the street where it is intended to lay the pavement called for in the proposed contract which the plaintiff seeks to restrain the laying of, the laying of sheet asphalt would be impracticable for the reason that the grade of the street is so steep and the fact that sheet asphalt becomes very smooth on the surface, and after a short time presents a slippery condition. After the asphalt becomes smooth, and the surface presents this slippery condition, it is almost impossible for horses to travel upon said asphalt without falling, and for this reason it was deemed unwise to lay sheet asphalt upon the street in question."

President Cromwell likewise shows the reason for the decision reached by himself and by the local board. In his affidavit he says:

"Deponent further says that because of the grade of the street and its condition it was unwise to advertise for bids for sheet asphalt pavement, as that is not a suitable pavement to lay on streets where the gradient is at all heavy, as in the case of Fingerboard road. The block asphalt and bitulithic pavements are, in the judgment of deponent and his engineers, suitable pavements to be laid on such streets, and are more nearly similar to each other than to sheet asphalt or to any other well known form of pavements."

The papers submitted on behalf of the city show further that both the president and the engineer, Oxholm, made a careful examination in various localities where bitulithic pavement had been laid, and there discovered that such pavement had proved itself to be satisfactory and durable. What was required on the Fingerboard road was not a

smooth, noiseless, slippery pavement like sheet asphalt, but a pavement so corrugated or otherwise roughened as to aid horses and vehicles in ascending and descending the steep grades which they would encounter. Under such conditions neither the president, the local board, nor the board of estimate and apportionment was called upon to permit bidding for smooth, noiseless, sheet asphalt pavement.

Paragraph 11 of the complaint in action No. 1 alleges that "bitulithic pavement is not a well-known form of smooth noiseless pavement." The city makes no pretense to the contrary; nor do the plaintiffs satisfy the court that asphalt block pavement may not properly enter into competition with bitulithic pavement. The crevices between the blocks may offer to horses the same resistance as rough bitulithic pavement; whereas, smooth sheet asphalt would wholly fail of any such result.

Among the irregularities complained of by the plaintiffs is the required use of two alleged patented machines.

In the Warren Case, in the Appellate Division, the record shows (volume 1189, App. Div. Cases, First Department, March, 1907, Library of Law Institute) that sections 95 and 96 of the specifications read as follows:

"Sec. 95. After rolling the wearing surface, there shall be spread over it a thin coating of Warren's Quick Drying Bituminous Flush Coat Composition, the purpose of this coating being to completely fill any unevenness or honeycomb which may appear in the surface of the mixture.

"Sec. 96. There shall be then rolled into the surface a thin layer of stone chips for the purpose of presenting a gritty surface which will not be slippery."

In the case at bar the same process is sought to be covered by section 52 of the specifications, in the following language:

"Sec. 52. After rolling the wearing surface there shall be spread over it, while it is still warm, a thin coating of Warren's Quick Drying Bituminous Flush Coat Composition, by means of a suitable flush coat spreading machine, so designed as to spread quickly over the surface a uniform thickness of flush coat composition. While the flush coat composition is still warm, there shall be spread over it, in at least two coats, fine particles of hot crushed stone, in sufficient quantity to completely cover the surface of the pavement. These stone chips shall be spread by means of a suitable stone spreading machine, so designed as to provide a storage receptacle of at least five (5) cubic feet capacity and to rapidly and uniformly cover the surface of the pavement with the desired quantity of stone. This spreading machine shall be provided with an adjustable attachment for regulating uniformly the quantity of stone spread at each operation. The hot stone chips shall be immediately and thoroughly rolled into the surface until it has become cool. The purposes of the flush coat composition and the fine particles of hot crushed stone are to not only fill any unevenness in the surface, but also to make the surface waterproof and gritty, thus providing a good foothold for horses."

To the introduction of these two machines (section 52), the plaintiffs attach great importance, insinuating that they are patented machines; although the plaintiffs fail to prove either that the machines are patented, or that they are controlled by Warren Bros. Company, notwithstanding the efforts of the plaintiffs to create such impression. The brief of counsel in action No. 1 reads:

"It is stated that these stone chips 'shall be spread by means of a suitable stone spreading machine, so designed as to provide a storage receptacle

of at least five cubic feet capacity and to rapidly and uniformly cover the surface of the pavement with the desired quantity of stone. The spreading machine shall be provided with an adjustable attachment for regulating uniformly the quantity of stone spread at each operation.' This obviously means that Warren Bros. Company have got a machine to do that work, and possibly because of the reason that they have not given it a number they refrain from describing it as 'Warren's No. ——— Puritan Brand Spreading Machine.' Nevertheless, it is probably patented; but whether it is patented or not, it is so carefully described and yet so vague that it would be exceedingly difficult for the successful bidder to know just how to make it even if he were allowed to make it."

"Nevertheless, it is probably patented." Would counsel, if the machines were in fact patented, have ended in the above diminuendo, or would he not have added to the 32 letters patent discovered by his expert affiant, Wilkinson, the numbers of letters patent covering such machines? Morrison's second affidavit does not state that the machines are patented, although cleverly drawn for that purpose. In such affidavit he merely expresses his own interpretation of section 52. If the machines were not patented, could Morrison be held for perjury upon his affidavit with respect to subdivisions "e" and "f"? Section 52 is intended for engineers and contractors. Compared with germane specifications (Nos. 95 and 96) in the Warren Case, section 52 simply introduces amplified details of a process to which the two machines are mere incidents, easy of construction. So they were considered by the engineers and by the three bidders for the bitulithic pavement. On the question whether the machines are patented, the most that even Morrison can say is:

"It is fair to assume that the careful description contained in the specifications of the kind of machine which must be used to comply with the contract is intended to describe and does describe a machine which Warren Bros. Company have designed, and presumably patented, and which they alone use in their paving business."

The plaintiffs make further complaint that the proceeding is vitiated by a call for "Warren's No. 24 Puritan Brand Bituminous Cement," a material which the plaintiffs claim is not included in the offer of Warren to furnish material at $1.44 per yard. Again, the brief of the plaintiff, in action No. 1, based on the first affidavit of Morrison and on the affidavit of Wilkinson, is called into play with the same inconclusiveness. Wilkinson states that:

"In the 32 patented combinations of cement of Warren Bros. Company he cannot distinguish Warren's No. 24."

This is followed by Morrison's statement, referring to Warren's No. 24, that:

"It is not included in the offers which they do make, either specifically or indirectly, except in so far as their agreement provides that the successful bidder may have a free license to use any of their patents, trade-marks," etc.

Even ignoring the failure of the plaintiffs to prove that "Warren's No. 24" is patented, and conceding that fact, for the sake of this argument, the plaintiffs have surely used no diligence to ascertain facts readily open to them. Admitting that Morrison has been unable to describe or buy this cement in open market, these facts alone do not fill the measure of diligence required of the plaintiffs. Have they gone

to Warren Bros. Company? Have they asked for the formula, or, more important than all, have they made any inquiry of Warren Bros. Company to find out whether the price of $1.44 included "Warren's No. 24"? In truth, what have they done that would and could have been effectively done by bona fide, intended bidders under the bitulithic method? Three contractors, either by the exercise of some intelligence or through some inquiry of which the plaintiffs are innocent, or from the specifications alone, have learned enough about "Warren's No. 24" to bid for the bitulithic pavement.

The question whether these actions are bona fide taxpayers' actions to restrain waste has not been considered, although strongly urged by the defendants, because the decision of that question seems to be unnecessary; nor need it now be considered whether the complainants state two separate causes of action which may be properly joined. The two claims in each action—the claims of the plaintiffs as injured taxpayers and their appeal to equity as plaintiffs who have been specially injured—are entirely dissimilar. In advancing the one claim, under section 603 of the Code, a plaintiff is required to show special injury to himself; under the second claim, a plaintiff is compelled to show injury to the city. The Code does not seem to provide for the joinder, in one action, of such remedies, and by analogy such procedure is condemned in the case of Warwick v. Mayor of City of New York, 28 Barb. 210, where the court, by Sutherland, J., uses the following language:

"By the Code the plaintiff may, in his complaint, present the facts which constitute his case, or cases, if he has more than one which may be united; but he cannot experiment with the court by trying first his own case, and then that of himself and others. The Code may cover a multitude of sins, but it is not so charitable as to permit the plaintiff to drop his own case and take up that of himself and neighbors in the same action."

The application to continue the injunction is denied in each case, with $10 costs. The stay in each case is vacated.

Application denied.